October 23, 2014

*VIA ECF*

Honorable Kimba M. Wood
United States District Judge
United States Courthouse
500 Pearl Street, Room 18B
New York, New York  10007

    Re:    *Gulino v. Board of Education*, 96-CV-08414 (KMW)

Dear Judge Wood:

    The plaintiffs and defendant Board of Education of the City School District of the City of New York ("BOE") submit this joint letter in response to the Court's Order dated October 15, 2014 [ECF No. 509]. The parties are available to the Court should Your Honor have any questions.

(1) *A copy of a single exemplary administration of each of the following exams: (a) LAST, (b) NTE (Communications Skills), (c) NTE (General Knowledge), (d) NTE (Professional Knowledge), (e) ATS-W, (f) CST, (g) EAS, (h) ALST, (i) EdTPA, (j) any other exam used by the State Education Department to make certification decisions since 1996.*

    The parties do not have access to these materials. The New York State Education Department ("SED") is the entity in the best position to produce them.

(2) *An analysis of whether there are certain categories of questions within the LAST that class members tended to get wrong.*

    The parties have been unable to identify any documentation analyzing whether there are particular categories of questions that class members—as opposed to all test takers—tended to get wrong. It is our understanding that the item-performance statistics referred to at the October 7, 2014 hearing related to all test takers and did not analyze the performance of class members. The entity in the best position to identify whether this specific analysis was ever undertaken is NCS Pearson, Inc., the successor entity to National Evaluation Systems, Inc. ("NES"), which developed the Liberal Arts and Sciences Test ("LAST").

(3) *Specific testimonial excerpts from trial stating that protecting students from having their educational opportunities harmed was not a factor taken into account when the LAST was designed.*

    As a threshold matter, there was no evidence presented at trial that NES or the SED identified any specific harm that the LAST was intended to protect against; articulated any concept of harm at any stage of the test-development process; or correlated performance on the LAST with any outcome (*i.e.*, student performance, teacher effectiveness, harm to students, etc.).

The testimonial evidence at trial, however, related to the concept of harm and harm prevention was as follows:

 a. Licensing and certification tests should be designed to prevent some sort of harm. (Tr. 1310:22-25; 1334:16-1336:2; 1360:6-9; 1361:4-8; 2039:21-2040:19; 3146:18-24) (all transcript excerpts are attached as Exhibit A).

 b. The test developer should have conducted a job analysis that identifies "behavior that will not create harm for the client population, students, or the public in general," (Tr. 1314:20-24), and should provide the results of the job analysis questionnaires, as well as information regarding decisions that were made based on empirical data or questionnaire data regarding cut scores. (Tr. 1325:18-25).

 c. There is no evidence that NES either addressed the concept of harm when designing the LAST, or designed the LAST to protect against it. (Tr. 1360:10-1361:1; Tr. 1403:2-23; 3149: 24-3150:3).

 d. Similarly, the SED never defined harm in the context of developing the LAST. (Tr. 3148:14-3149:8).

 e. A test cut score is the practical application of the test result. It should say that people who score below a certain level are likely to do harm and should not be exposed to the client population, and those who score above that level, are not likely to do harm and may be exposed to the client population. (Tr. 1361:9-20). Setting the cut score on an employment test at the wrong level can make the test invalid if that cut score disqualifies teachers who would have performed well (*i.e.*, would not have caused harm). (Tr. 1343:2-17).

 f. The LAST cut scores were never correlated with the prevention of harm or the performance of teachers. (Tr. 1362:22-1364:2; 1364:15-1365:19; 1368:18-25). In fact, no data was produced demonstrating any relationship between LAST scores and either classroom performance of a teacher or outcome effects on students, including reducing harm in the school environment. (Tr. 1363:10-1364:2).

 g. The BOE's conduct of allowing teachers to teach for many years without passing the LAST and without doing any analysis correlating teacher performance on the LAST with performance in the classroom undercuts any suggestion that the LAST provided useful inferences about who would or would not cause harm in the classroom. (Tr. 1365:20-1370:13).

(4) *A statement of approximately how much state and federal funding Defendant would lose were it to exempt class members from having to pass the LAST, without a Court injunction ordering it to do so.*

 The BOE investigated the amount of money that could be lost if it were to hire teachers lacking state certification, as required under New York State Education Law. See Educ. L. § 3001(2). As more fully described below, the BOE estimates that, at a minimum, there would be a dollar for dollar loss of New York State funding equal to the

salary of each uncertified teacher employed by the BOE. However, it is possible that BOE would jeopardize the full amount of state aid it receives if it were to employ uncertified teachers: this would amount to a loss of $6.5 billion in aid. Additionally, BOE's employment of uncertified teachers would result in a loss of over $1 billion in Federal funds.

Most of BOE's categorical Federal grants, including those under Title I, Title II, Title III of the Elementary and Secondary Education Act of 1965 ("ESEA") and the Individuals with Disabilities Education Act ("IDEA"), require compliance with the No Child Left Behind Act of 2001 ("NCLB"). The NCLB requires employment of "highly qualified" teachers for core academic areas. See 34 C.F.R. § 200.55 (2014). As such, the vast majority of DOE teachers, including special education teachers, fall under this requirement. To be deemed "highly qualified", teachers must have, at minimum, state certification. See 34 C.F.R. § 200.56 (2014). Federal funding flows to BOE through the State. There is a strong argument that the State could withhold all funds Federal allocated to BOE for failing to comply with the NCLB by employing uncertified teachers.[1] For this year, these Federal funds total over $1 billion.[2]

In addition to the Federal aid, BOE receives basic aid from the State, which is known as "Foundation Aid." This year, the Foundation Aid amounted to $6.5 billion. DOE cannot use the State funds to pay the salary of an unqualified teacher. See Educ. L. § 3009(1). It is thus arguable that for each uncertified teacher the DOE hires, the State could withhold a pro-rata amount of that aid. The $6.5 billion in State aid translates to approximately $87,000 for each BOE teacher. Consequently, for each uncertified teacher employed by BOE, the State could deduct $87,000, or, at a minimum, the amount equal to the actual salary of those teachers.[3] By illustration, if BOE hired 100 uncertified teachers, the loss of State aid would be in the amount of $5 million to $8.7 million. However, given that the Education Law mandates that only certified teachers be employed, it is conceivable that the entire $6.5 billion in Foundation Aid could be at risk.

---

[1]   Plaintiffs believe that any insistence by the State that the BOE continue to make employment decisions based on the results of the LAST that was the subject of this Court's December 2012 opinion would be a further violation of Federal anti-discrimination law.

[2] In this context, the Federal funding to BOE for this year is:
    Title I, A & D - $662,407,093
    Title II A - $100,559,945
    Title III LEP - $31,025,660
    Title III Immigrant - $1,208,175
    IDEA 619 Funding: $272,666,477

[3] In Fall 2015, the minimum salary would be $50,000. However, depending on their prior experience, a class member seeking employment could receive a higher salary.

- 4 -

Respectfully submitted,

_____ /jsc          /s/ Joshua S. Sohn
William S.J. Fraenkel                    Joshua S. Sohn
Grace D. Kim                             DLA Piper LLP (US)
Benjamin E. Stockman                     1251 Avenue of the Americas
Assistant Corporation Counsel            New York, New York  10020
New York City Law Department             (212) 335-4500
100 Church Street, Rm. 2-197
New York, New York  10007
(212) 356-2442                           *Attorneys for Plaintiffs*

*Attorneys for Defendant*
*New York City Department of Education*

cc:    John Siffert, Esq.